THIS ORDER IS APPROVED.

Dated: October 1, 2026

Brenda Moody Whinery, Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| In re:<br><br>SQUARED UP HOSPITALITY, INC.<br><br>Debtor. | Chapter 7 Proceeding<br><br>Case No. 4:23-bk-03540-BMW |
| Misty Weigle,<br><br>Plaintiff,<br><br>v.<br><br>CFG MERCHANT SOLUTIONS, LLC; and WYNWOOD CAPITAL, LLC,<br><br>Defendants. | Adv. Case No. 4:24-ap-00208-BMW<br><br>**RULING AND ORDER REGARDING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. 110) AND DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. 108)** |

This adversary proceeding was commenced on September 19, 2024, by Misty Weigle, the Successor Chapter 7 Trustee (the "Trustee") administering the bankruptcy estate in the bankruptcy case (the "Bankruptcy Case") filed by Squared Up Hospitality, Inc. (the "Debtor" or "Squared Up") on May 27, 2023 (the "Petition Date"). The remaining defendants are CFG Merchant Solutions, LLC ("CFG") and Wynwood Capital Group, LLC ("Wynwood" and collectively with CFG, the "Defendants").

This adversary action involves an agreement the Debtor entered into with CFG, an agreement the Debtor entered into with Wynwood, and payments made pursuant to those agreements and related documents. The operative *First Amended Complaint* (the "Amended Complaint") (Dkt. 100) contains three counts. Relevant to this matter, in Count One, the Trustee

seeks to avoid and recover certain payments made to the Defendants on the basis that they are preferential payments under § 547(b) of the Bankruptcy Code (hereinafter "Count One" or the "Preference Claim"). In Count Three, the Trustee seeks to recover certain amounts collected by the Defendants on the basis that the agreements between the Debtor and the Defendants are usurious loans under Arizona law (hereinafter, "Count Three" or the "Usury Claim").

Before the Court are the *Defendants' Motion for Partial Summary Judgment* (Dkt. 108) as to Count Three (the "Defendants' Motion"), the *Plaintiff's Amended Motion for Partial Summary Judgment* (Dkt. 110) as to Count One and Count Three (the "Trustee's Motion"), and the pleadings, statements of fact, declarations, exhibits, and documents related thereto (Dkts. 109, 111, 121, 122, 125, 126, 132, 133). On September 30, 2026, the Court held oral argument and took the matter under advisement. The Court now issues its ruling and order.

## I. <u>Jurisdiction</u>

The Trustee acknowledges that this Court has jurisdiction over the counts asserted in the Amended Complaint, and the Trustee consents to this Court's entry of final orders and/or judgments. (Dkt. 100 at ¶¶ 4-8).

Count One is a core claim that arises under the Bankruptcy Code. Even if Count One is a *Stern* claim, the Defendants consented to this Court's entry of final orders and/or judgments with respect to Count One in their answers to the original complaint, and they cannot retract that consent now. (Dkt. 22 at ¶ 12; Dkt. 23 at ¶ 12; *see* Local Rule 7012-1).

Count Three is a usury claim brought pursuant to Arizona state law. Count Three does not arise under or in the Bankruptcy Code, but is related to the underlying Bankruptcy Case. Given that the Court has only related to jurisdiction over Count Three, Count Three is not a core claim. *See Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 34, 134 S. Ct. 2165, 2172, 189 L. Ed. 2d 83 (2014). The Defendants do not consent to this Court's entry of final orders or judgments with respect to Count Three. (Dkt. 103 at ¶ 6).

/ / /

/ / /

## II. Facts

### A. Background and Parties

The Debtor is an Arizona corporation that operated a restaurant in California.[1] (*See* Admin. Dkt. 1 at 1; (CFG Agreement at 1; Wynwood Agreement at 1). CFG is a Delaware LLC located in New York, doing business in New York, that offers revenue-based financing to businesses. (Def. SOF at ¶ 2; Def. Controverting SOF at ¶¶ 2, 3; CFG Agreement at 1). Wynwood is located in New York and Florida and provides working capital to businesses. (Def. SOF at ¶ 10; Def. Controverting SOF at ¶ 14).

### B. The CFG Agreement

On October 27, 2022, the Debtor and CFG entered into a *Purchase Agreement* (the "CFG Agreement") (Dkt. 109-1 at 4-12; Dkt. 111-2 at 33-41), pursuant to which CFG agreed to pay the Debtor $100,000, less fees, in exchange for $148,000 of the Debtor's future receivables (the "Amount Sold"), which amount was to be paid by the Debtor in daily installment payments of $955.00 (Monday through Friday of each week) (the "CFG Daily Payment"). The CFG Daily Payment represented 15% of the Debtor's Future Receipts, defined as "the proceeds of each future sale made by Seller." (CFG Agreement at §§ 1-2; Pl. SOF at ¶¶ 6-7; Def. SOF at ¶¶ 3-6). The CFG Daily Payment was calculated using the following formula: Debtor's average monthly sales x Purchased Percentage / average business days in calendar month. (CFG Agreement at 1).

Pursuant to the CFG Agreement, the Debtor was required to designate and obtain approval of a bank account into which the Debtor would deposit all future receipts and from which CFG would debit the CFG Daily Payment. (CFG Agreement at § 2; Def. SOF at ¶ 5). The Debtor designated, and CFG approved, that the Debtor's Chase bank account ending in -6235 (the "Chase Bank Account") would be used. (Dkt. 111-2 at 44).

The CFG Agreement contains reconciliation provisions (the "CFG Reconciliation Provisions") pursuant to which the amount of the CFG Daily Payment could be adjusted at the request of the Debtor "[f]or as long as no Event of Default has occurred, once each calendar

[1] Although in her pleadings the Trustee asserted that the Debtor operated Arizona restaurants, the Trustee acknowledged during oral argument, and the record in the Bankruptcy Case confirms, that the Debtor operated its single restaurant in California.

month, . . . to more closely reflect the Seller's actual Future Receipts times the specified Purchased Percentage." (CFG Agreement at § 8; *see also* Def. SOF at ¶ 6).

The CFG Agreement contains a Nonrecourse Sale of Future Receipts; No Right to Repurchase; and Non-Consumer Transaction provision, which provides that the transaction was a sale, that the Debtor had no right to repurchase the receivables at issue, and that "[i]f the Amount Sold is never remitted because Seller's business went bankrupt or otherwise ceased operations in the ordinary course of business, and Seller has not breached this Agreement, Seller would not owe anything to Buyer and would not be in breach of or default under this Agreement" (the "CFG Bankruptcy Provision"). (CFG Agreement at § 7).

Under the CFG Agreement, "the breach by Seller of any covenants, terms or conditions contained in this Agreement" constituted an event of default. (CFG Agreement at § 13). Among other remedies, the CFG Agreement authorized CFG to automatically debit from the Chase Bank Account the total amount due under the CFG Agreement and collect liquidated damages. (CFG Agreement at §§ 14-15). In the event of a default, an irrevocable Power of Attorney provision in the CFG Agreement also gave CFG authority to, among other things, obtain and adjust insurance, sign the Debtor's name on invoices, file claims, and use the Debtor's funds to pay CFG's legal fees. (CFG Agreement at § 3).

The CFG Agreement also provides that it constitutes a security agreement under the Uniform Commercial Code ("UCC"), that CFG would have all the rights of a secured party under the UCC with respect to the Debtor's Future Receipts, and that CFG was authorized to file UCC forms. (CFG Agreement at §§ 16-17; *see also* Pl. Controverting SOF at ¶ 8).

In connection with the CFG Agreement, the Debtor's principal, Matthew Serventi (the "Debtor's Principal"), executed a *Personal Guaranty of Performance* (the "CFG Guaranty") (Dkt. 109-1 at 13-14; Dkt. 111-2 at 42-43) "irrevocably, absolutely and unconditionally" guaranteeing the Debtor's performance under the CFG Agreement.

Both the CFG Agreement and CFG Guaranty contain New York choice of law provisions. (CFG Agreement at § 27; CFG Guaranty at § 6).

On or about November 3, 2022, CFG began ACH debits of the CFG Daily Payment from

the Chase Bank Account. (Def. SOF at ¶ 8; *see also* Pl. SOF at ¶ 9).

At no time did the Debtor request an adjustment of the CFG Daily Payment. (Def. Controverting SOF at ¶ 12). Between November 3, 2022 and February 24, 2023, the Debtor paid CFG $72,580. (Pl. SOF at ¶ 9). During the 90-day preference period preceding the Petition Date, between February 27, 2023 and May 15, 2023, the Debtor paid CFG $53,480 (the "CFG Payments"). (Pl. SOF at ¶¶ 9, 11). On May 15, 2023, within two weeks of the Petition Date, CFG filed a UCC-1 Financing Statement with the Arizona Secretary of State (the "CFG UCC-1 Financing Statement") that identifies CFG as a Secured Party and describes the Collateral as: "All assets now owned or hereafter acquired." (Pl. SOF at ¶ 8; Dkt. 111-2 at 46).

The Trustee calculates that the effective interest rate that CFG charged to the Debtor over the entire 150-day term of the parties' agreement was 125.28%. (Pl. SOF at ¶ 9). CFG contests that there was any interest component in the transaction.

### C. The Wynwood Agreement

On January 9, 2023, the Debtor and Wynwood entered into a *Standard Merchant Cash Advance Agreement* (the "Wynwood Agreement," and collectively with the CFG Agreement, the "Agreements") (Dkt. 109-2 at 5-15; Dkt. 111-2 at 2-12). (Pl. SOF at ¶ 2; Def. SOF at ¶ 11). Under the Wynwood Agreement, Wynwood agreed to pay the Debtor $50,000, less fees, in exchange for $74,950 of the Debtor's future receivables (the "Receivables Purchased Amount"), which amount was to be paid by the Debtor in daily installments of $936.88 (Monday through Friday of each week) (the "Wynwood Daily Payment") until the Receivables Purchased Amount was paid in full. (Wynwood Agreement at p. 1 & § 1; Pl. SOF at ¶ 3; Def. SOF at ¶¶ 12-13). The Wynwood Daily Payment was intended to be an approximation of no more than 14% of the Debtor's future receivables. (Dkt. 111-2 at 22).

The Wynwood Agreement contains a Sale of Receivables provision, which provides that the transaction was not intended to be and should not be construed as a loan, and therefore does not have an interest rate. (Wynwood Agreement at § 15). The Wynwood Agreement contains trust language (the "Trust Provision"), which provided that the Debtor's receivables, up to the balance of the Receivables Purchased Amount, would be property of Wynwood until paid in full,

and that the Debtor would serve as a fiduciary for Wynwood and hold its receivables in trust for Wynwood. (Wynwood Agreement at § 1; *see also* Def. Controverting SOF at ¶ 18).

The Debtor was required to designate and obtain approval of a bank account into which the Debtor would deposit all receivables and from which Wynwood would debit the Wynwood Daily Payment. (Wynwood Agreement at § 1; Def. SOF at ¶ 13). The Debtor designated, and Wynwood approved, that the Chase Bank Account would be used. (Dkt. 111-2 at 17).

Although the Wynwood Agreement provides that "[t]he term of this Agreement is indefinite . . ." (Wynwood Agreement at § 7; Def. Controverting SOF at ¶ 19) and contains a Reconciliations provision (the "Wynwood Reconciliations Provision") (Wynwood Agreement at § 4), the Wynwood Agreement does not allow for an adjustment of the Wynwood Daily Payment; it provides only for an account credit in the event of overcollection or additional payments in the event of under collection. (Wynwood Agreement at § 4).

The Wynwood Agreement contains a Prepayments provision, which authorized the Debtor to "prepay any amount towards the Receivables Purchased Amount" and "terminate this Agreement by prepaying WCG the amount of the balance of the Receivables Purchased Amount at that time." (Wynwood Agreement at § 5).

There are ordinary course provisions in the Wynwood Agreement (Wynwood Agreement at § 8), and the Debtor's Principal executed a *Declaration of Ordinary Course of Business* (Dkt. 109-2 at 27; Dkt. 111-2 at 24) prepared by Wynwood.

The Wynwood Agreement also provides that the Debtor would obtain Wynwood's approval to enter into any future agreement involving any of its receivables, including those that were not part of the Receivables Purchased Amount. (Wynwood Agreement at § 29). To further secure performance of its obligations, the Wynwood Agreement provides that the Debtor grants Wynwood a security interest in, among other assets, "(a) all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, and instruments . . . now or hereafter owned or acquired . . .; and (b) all proceeds . . . ." (Wynwood Agreement at § 31). The security interest granted by the Debtor in the Wynwood Agreement was then significantly expanded in the *Addendum to Merchant Cash Advance*

*Agreement for Additional Security Interests* (the "Wynwood Security Interests Addendum") (Dkt. 109-2 at 28-33; Dkt. 111-2 at 25-30), which provides that the Debtor and three affiliates granted Wynwood a security interest in "all accounts . . . chattel paper, documents, equipment, general intangibles, instruments, and inventory . . . now or hereafter owned or acquired . . . and . . . all proceeds[,]" and "agree[ed] not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to [such collateral] . . . ." The Debtor's Principal also executed a *Guarantee* (the "Wynwood Guarantee") (Dkt. 109-2 at 16-19; Dkt. 111-2 at 13-16), guaranteeing the Debtor's performance of all representations, warranties, and covenants made in the Wynwood Agreement.

The Wynwood Agreement contains extensive default provisions. (*See* Wynwood Agreement at § 32). In the event of a default, the Wynwood Agreement and related documents provide that Wynwood could, among other things, collect the full outstanding balance owed under the Wynwood Agreement, enforce its broad security interests against the Debtor's assets, enforce its broad security interests against assets owned by the Debtor's affiliates pursuant to the Wynwood Security Interests Addendum, enforce the Wynwood Guarantee executed by the Debtor's Principal, demand assignment of the lease for the Debtor's premises, and require the Debtor to pay liquidated damages. (Wynwood Agreement at §§ 17, 33; Wynwood Guarantee at §§ G1, G3; Wynwood Security Interests Addendum at § S4).

The Wynwood Agreement further provides that "WCG is entering into this Agreement knowing the risks that each Merchant's business may decline or fail, resulting in WCG not receiving the Receivables Purchased Amount. Any Merchant going bankrupt or going out of business or experiencing a slowdown in business or a delay in collecting Receivables will not on its own without anything more be considered a breach of this Agreement" (the "Wynwood Bankruptcy Provision"). (Wynwood Agreement at § 15).

The Wynwood Agreement and related documents contain New York choice of law provisions. (Wynwood Agreement at § 36; Wynwood Guarantee at § G5; Wynwood Security Interests Addendum at § S5).

The Trustee acknowledges that on January 10, 2023, Wynwood filed a UCC-1 Financing

Statement, but does not indicate the jurisdiction in which it was filed. (*See* Pl. SOF at ¶ 4; Pl. Controverting SOF at ¶ 4). A copy of such document has not been attached to any pleadings filed in this matter. According to the Trustee's statements of fact, the Wynwood UCC-1 Financing Statement covers, among other assets, "[a]ll accounts receivable, receipts, instruments, contract rights and other rights to receive the payment of money, patents chattel paper, licenses, leases and general intangibles, whether now owned, acquired or arising" of the Debtor. (Pl. SOF at ¶ 4; Pl. Controverting SOF at ¶ 4).

On or about January 10, 2023, Wynwood began daily ACH debits of the Wynwood Daily Payment from the Chase Bank Account. (*See* Pl. SOF at ¶ 5; Def. SOF at ¶ 16). The Wynwood Daily Payment for April 28, 2023 was returned due to insufficient funds, but daily Wynwood ACH debits continued thereafter, and no party alleges that there were any additional irregularities, payment changes, or payment failures prior to the Petition Date. (*See* Def. SOF at ¶ 17). The Debtor at no time requested an adjustment of the Wynwood Daily Payment. (Def. SOF at ¶ 18).

It is uncontested that from January 10, 2023 to February 26, 2023, the Debtor paid Wynwood $31,853.92. (Pl. SOF at ¶ 5). During the 90-day preference period preceding the Petition Date, between February 27, 2023 and May 5, 2023, Wynwood received between $45,956.72 and $46,843.99 from the Debtor (the "Wynwood Payments," and collectively with the CFG Payments, the "Payments"). (Pl. SOF at ¶ 5; Def. Controverting SOF at ¶ 24).

According to the Trustee, the effective interest rate Wynwood charged to the Debtor over the 80-day term of the parties' agreement was 309.29%. (Pl. SOF at ¶ 5). Wynwood disputes that there was any interest component in the transaction.

**D. Other Merchant Cash Advance Transactions**

The Debtor executed a merchant cash advance agreement with Fundamental Capital, which filed a UCC-1 Financing Statement with the Arizona Secretary of State on February 22, 2023 (the "Fundamental Capital UCC-1 Financing Statement"), after Wynwood purportedly filed a UCC-1 Financing Statement, but before CFG filed its UCC-1 Financing Statement. (Pl. SOF at ¶ 12; Dkt. 126-4 at 48). The Fundamental Capital UCC-1 Financing Statement covers, among

other assets "all of Seller's presently owned or hereafter acquired (a) goods, (b) instruments, (c) promissory notes, (d) chattel paper . . . , (g) accounts, (h) accounts receivable, (i) equipment, (j) inventory, (k) commercial tort claims, (l) general intangibles, (m) payment intangibles, and (n) software . . . [,]" "limited to outstanding obligations between Secured Party and Seller." (Dkt. 126-4 at 48). Fundamental Capital filed a proof of claim in the Bankruptcy Case in the amount of $143,717.32.

**E. The Bankruptcy Estate**

The schedules reflect that on the Petition Date the Debtor had accounts, cash, and cash equivalents totaling $4,936. (Admin. Dkt. 46 at 1). The Debtor estimated that the value of its other assets as of the filing date was $100,881.84. (Admin. Dkt. 46 at 6). The Debtor estimated that its assets as of the date the Bankruptcy Case was converted to Chapter 7 had a value of approximately $102,565.79. (Admin. Dkt. 70).

## III. Positions of the Parties

The Trustee takes the position that she is entitled to summary judgment as to Count One because the Agreements are disguised loans executed while the Debtor was insolvent that allowed the Defendants to recover more than they would have recovered under Chapter 7. The Defendants argue that a request for such a finding was not pled in the Amended Complaint; dispute that the Agreements are disguised loans; dispute that the Payments were transfers of Debtor funds; and assert that, even if the Trustee is able to establish the elements of her Preference Claim, there are genuine issues of material fact as to whether the ordinary course of business defense applies.

The Trustee argues that she is entitled to summary judgment as to Count Three on the basis that the effective interest rates charged to the Debtor under the Agreements are usurious under Arizona law. The Defendants assert that New York law applies to the transactions, and that as a result, they are entitled to summary judgment as to Count Three regardless of whether the agreements at issue are true sales or disguised loans.

/ / /

/ / /

## IV. Law and Analysis

### A. The Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a), which is incorporated by Federal Rule of Bankruptcy Procedure 7056, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court must view the evidence in the light most favorable to and draw all justifiable inferences in favor of the non-moving party. *Id*. at 255.

The summary judgment rules do not authorize a trial on affidavits. *Id*. The Court cannot make credibility determinations or weigh evidence at the summary judgment stage. *Id.* Further, trial courts may act with caution and may deny summary judgment "where there is reason to believe that the better course would be to proceed to a full trial." *Id.*

### B. The Expert Report

As a preliminary matter, the Trustee filed an expert report (the "Expert Report") prepared by Dennis L. Winans, a Certified Public Accountant employed by the Estate, in support of the Trustee's Motion. The Defendants argue that the Expert Report is inadmissible because it contains impermissible legal conclusions and ignores authority that supports the Defendants' position.

The Court does not need to consider the Expert Report for purposes of this summary judgment ruling. As a result, the Court need not determine whether or to what extent the Expert Report is admissible at this time.

### C. The Defendants' Pleading Arguments

The Defendants assert that if the Trustee intended to ask this Court for a determination that the Agreements are disguised loans, the Trustee was required to plead a separate, independent claim for declaratory relief asking the Court to recharacterize the transactions as loans.

The Trustee disputes that her disguised loan theory was not adequately pled and notes that the Amended Complaint expressly refers to the Agreements as "loans" and pleads facts that support the loan characterization. Read as a whole, the Trustee maintains that the Amended Complaint gives fair notice to the Defendants and therefore does exactly what Federal Rule of Civil Procedure 8 ("Rule 8") requires. The Trustee further notes that in their answer to the Amended Complaint, the Defendants explicitly denied her allegations that the transactions at issue are loans, and in making such denials, acknowledged awareness of her loan theory.

"Rule 8 requires every 'pleading that states a claim for relief [to] contain' three things: 'a short and plain statement of the grounds for the court's jurisdiction,' 'a short and plain statement of the claim showing that the pleader is entitled to relief,' and 'a demand for the relief sought.'" *Gibson v. City of Portland*, 165 F.4th 1265, 1287 (9th Cir. 2026) (quoting Fed. R. Civ. P. 8(a)(1)-(3)). The Rule 8 pleading standard is liberal and is intended to simplify the pleading system and focus the litigation on the merits of the claims. *Id.*; *Austin v. Univ. of Oregon*, 925 F.3d 1133, 1137 (9th Cir. 2019). The Trustee sufficiently pled all elements of her Preference Claim and her Usury Claim in the Amended Complaint, including that the Payments were made on account of antecedent debts owed by the Debtor (Dkt. 100 at ¶ 25) and that the Agreements were "intentionally stylized as purchases, but . . . were substantively loans" (Dkt. 100 at ¶ 33), which allegations the Defendants expressly acknowledged and disputed in their answer (Dkt. 103 at ¶¶ 14, 17, 18, 21, 25, 33, affirmative defenses ¶ 1). There are no unfair surprises in the Trustee's Motion, and none of the cases cited by the Defendants in support of their position stand for the proposition that a request for declaratory relief is required in order for a plaintiff to pursue a preference claim or state law usury claim under a theory that the underlying agreement is a disguised loan. The case law cited simply acknowledges that disguised loan issues and related claims may be brought before a court in numerous ways. Further, given that the counts at issue necessarily require the Court to determine whether the Agreements are loans, any separate request for declaratory relief that the Agreements are loans would have been subsumed by such counts. *Rhodes v. Robinson*, 408 F.3d 559, 566 n.8 (9th Cir. 2005); *In re Davies,* Nos. CC-11-1221-MkHPa, 6:10-bk-37900-SC, 6:11-ap-01001-SC, 2012 WL 370689 at *6 (9th Cir. B.A.P.

Jan. 12, 2012), *aff'd*, 565 F. App'x 630 (9th Cir. 2014).

Given the foregoing, the Defendants' pleading arguments fail as a matter of law.

**D. Count One – The Trustee's Preference Claim**

In Count One, the Trustee alleges that she is entitled to recover the Payments pursuant to § 547(b) of the Bankruptcy Code.

Section 547(b) provides in relevant part:

> [T]he trustee may, based on reasonable due diligence in the circumstances of the case and taking into account a party's known or reasonably knowable affirmative defenses under subsection (c), avoid any transfer of an interest of the debtor in property –
> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made –
> (A) on or within 90 days before the date of the filing of the petition . . .
> (B) . . . ; and
> (5) that enables such creditor to receive more than such creditor would receive if –
> (A) the case were a case under chapter 7 of this title;
> (B) the transfer had not been made; and
> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

The Trustee has the burden of establishing each of the elements of her § 547(b) claim by a preponderance of the evidence. *In re Lee*, 179 B.R. 149, 155 (9th Cir. B.A.P. 1995), *aff'd,* 108 F.3d 239 (9th Cir. 1997).

**1. Whether the Payments Were Made to Creditors for or On Account of Antecedent Debts**

The Trustee argues that because the Agreements are disguised loan agreements, not true sales, the Payments were made to creditors on account of antecedent debts. The Defendants maintain that the Agreements are sales of future receivables.

Absent a contrary rule in the Bankruptcy Code, bankruptcy courts look to state law to determine whether an agreement constitutes a loan or a sale. *Cap Call, LLC v. Foster (In re Shoot*

*the Moon), LLC*, 635 B.R. 797, 811-12 (Bankr. D. Mont. 2021). As discussed herein, New York, Arizona, and California all have notable connections to certain of the parties and/or the transactions. That being said, at least one court has "perceive[d] no material difference in particular states' laws regarding the distinction between sales and loans[,]" *id.* at 813, and in this case, all three states approach the legal question of whether to classify a transaction as a sale or a loan in substantially the same way, taking a holistic, substance-over-form approach to determine the true nature of the transaction. *E.g., LG Funding*, *LLC v. United Senior Props. of Olathe, LLC*, 181 A.D. 3d 664, 665-66, 122 N.Y.S.3d 309 (N.Y. App. Div. 2d Dept. 2020); *Britz v. Kinsvater*, 87 Ariz. 385, 391-92, 351 P.2d 986, 990 (Ariz. 1960); *West Pico Furniture Co. v. Pac. Fin. Loans*, 2 Cal. 3d 594, 603, 469 P.2d 665, 671 (Cal. 1970). Thus, the Court need not engage in a choice of law analysis in order to determine whether the Agreements constitute sales or loans. *In re Shoot the Moon*, 635 B.R. at 812.

To guide their analyses, courts often look to non-exclusive factors, including:

(1) The language of the documents and conduct of the parties;

(2) Whether the agreement has a finite term;

(3) Whether the buyer has recourse against the seller, including in the event the seller files for bankruptcy;

(4) Whether the seller continues to service the accounts and commingles receipts with operating funds;

(5) Whether the buyer conducted an independent investigation into the credit of the account debtor;

(6) Whether the seller has a right to excess collections;

(7) Whether the buyer can unilaterally alter the pricing terms;

(8) The absence or presence of a working reconciliation provision;

(9) Whether the seller has the absolute power to alter or compromise the terms of the underlying asset; and

(10) Whether the seller retains the right to repurchase the accounts.

*See In re Shoot the Moon*, 635 B.R. at 813; *LG Funding, LLC*, 181 A.D.3d at 666.

"That said, a consideration that overlays and unites the factors is how the parties allocated risk." *In re Shoot the Moon, LLC*, 635 B.R. at 813. A transaction is typically a sale if the risk of loss passes to the buyer. *Id.* In a disguised loan, "the putative seller typically remains exposed to the underlying receivables and may grant the putative buyer recourse to sources of recovery beyond the receivables." *Id.* at 814.

In addition to the foregoing, under general property law principles, an agreement cannot constitute a true sale of receivables if, at the time of execution, the merchant lacks rights in the receivables and the agreement purports to convey not a specific receivable, but a fixed dollar amount sourced from an undefined stream of future receivables. Chrys Ondersma, *Merchant Cash Advances are Not Sales*, 100:2 Am. Bankr. L. J. Vol 429, 429 (2026). "One can promise to sell something one later acquires, but that is . . . not a transfer of property." *Id.* at 440.

**a. The CFG Agreement**

The undisputed facts and substance of the CFG Agreement lead to the conclusion that the CFG Agreement is a disguised loan, not of a true sale of receivables.

Although the CFG Agreement is titled a "Purchase Agreement" and contains sale terminology, the CFG UCC-1 Financing Statement uses loan terms, refers to CFG as "the secured party," and refers to Squared Up as the "Debtor." Further, the security interest granted to CFG is much broader and more expansive than the kind of security interest that would typically be associated with a sale of receivables. *See In re Shoot the Moon*, 635 B.R. at 814-15. To secure the Debtor's performance under the CFG Agreement, the CFG Agreement granted CFG a security interest in the Debtor's Future Receipts, yet the CFG UCC-1 Financing Statement describes its collateral as "[a]ll assets now owned or hereafter acquired." The filing of a financing statement is not necessarily indicative of a loan, but the content of a financing statement may be. *See In re Shoot the Moon*, 635 B.R. at 815. Unless the CFG Agreement is in fact a loan, there is no reason why CFG should have been granted security interests in assets of the Debtor beyond the purchased receivables, including assets that have little relationship to the accounts that CFG purported to purchase. *See id.* "The fact that the documents contemplate a broad security package . . . to generally collateralize payment obligations is indicative of a loan, not a sale." *Id.*

Moreover, upon the Debtor's breach of any term of the CFG Agreement, the CFG Agreement authorized CFG to automatically debit the Debtor's Chase Bank Account for the full amount due. It further authorized CFG to exercise rights and remedies beyond CFG's collateral pursuant to the power of attorney provision, which granted CFG the authority to, among other things, obtain and adjust insurance and file claims on behalf of the Debtor. Further, the unconditional CFG Guaranty executed by the Debtor's Principal allowed CFG to pursue him for the full amount owed by the Debtor. In effect, the CFG documents gave CFG an absolute right to payment, consistent with a loan agreement.

Contrary to CFG's argument that the CFG Bankruptcy Provision is evidence that CFG recognized there could be circumstances under which the Debtor would no longer be required to remit the "purchased" receivables, the CFG Bankruptcy Provision, is conditioned upon there being no existing breach of the CFG Agreement, and as a result, provided the Debtor little to no realistic protection or relief from payment of the full obligation. The nominal risk that the CFG Bankruptcy Provision allocates to CFG is generally consistent with risks that lenders take.

In addition to the foregoing features of the CFG transactions, which placed the risk overwhelmingly upon the Debtor and the Debtor's Principal, the CFG Reconciliation Provisions provided the Debtor with no meaningful mechanism for ensuring that the CFG Daily Payment would be consistent with the percentage of daily receivables CFG could collect. The CFG Reconciliation Provisions allowed the Debtor to request an adjustment at most once per month, and only "[f]or as long as no Event of Default has occurred." The once-per-month limit renders the protections of the provision illusory, and given that a debtor/seller is unlikely to go through a reconciliation request process absent cash flow issues and a likely breach or impending breach of its financial obligations, the CFG Reconciliation Provisions provided the Debtor with no meaningful protection. Further, the CFG Reconciliation Provisions did not require CFG to return any funds found to have exceeded the "purchased" percentage of receivables. Moreover, because the CFG Reconciliation Provisions are illusory, [a]lthough the CFG Agreement does not contain a stated maturity date, the CFG Agreement has a de facto fixed term that can be easily calculated.

Other provisions of the CFG Agreement and features of the transaction further support a

finding that the CFG Agreement is a disguised loan agreement, not a true sale. CFG did not purportedly purchase any discrete or identifiable receivables, and under the CFG Agreement, the Debtor continued to service, collect, and commingle receivables in the Chase Bank Account.

Given the foregoing, and given that the Debtor and the Debtor's Principal were, in effect, absolutely obligated to tender the full agreed-upon amount to CFG, that the Debtor was prohibited from "repurchasing" the Amount Sold is of no real significance.

Ultimately, the Debtor and its principal, not CFG, bore the risk of the parties' transaction. The Debtor's obligation to pay $148,000 to CFG was independent of the collectability of any particular receivable, and the CFG documents gave CFG recourse and expanded legal rights against the Debtor and the Debtor's Principal. As courts faced with similar transactions have recognized, the "panoply of rights, remedies, and potential control is highly unusual in the context of an asset sale[,]" and is consistent with a debtor-creditor relationship. *In re Shoot the Moon*, 635 B.R. at 817. "'Simply calling transactions "sales" does not make them so' because '[l]abels cannot change the true nature of the underlying transactions.'" *Id.* at 819 (quoting *Fireman's Fund Ins. v. Grover (In re Woodson Co.)*, 813 F.2d 266, 272 (9th Cir. 1987)).

Based upon the undisputed facts and the totality of the foregoing, it is the determination of this Court that the CFG Agreement is a disguised loan agreement, not a true sale of assets.

**b. The Wynwood Agreement**

The substance of the Wynwood Agreement is similar in many respects to the CFG Agreement, especially with respect to the terms of payment, excessive collateralization, the expansive rights and recourse options granted to Wynwood, and the overall allocation of risk.

As with the CFG Agreement, the Debtor continued to service, collect, and commingle its receivables in the Chase Bank Account. The Debtor's financial obligations under the Wynwood Agreement are not tied to any specific receivables, and cannot be traced to any identifiable receivables given the Debtor's commingling of funds. Further, the Wynwood Reconciliations Provision authorized Wynwood to collect the Wynwood Daily Payment on each designated day, regardless of the Debtor's actual income. As a result, the Wynwood Agreement has a de facto fixed term that can be calculated using simple math.

Although the Wynwood Agreement purports to prohibit the Debtor from repurchasing the receivables at issue, the Wynwood Agreement also contains the Prepayment Provision, which, in effect, authorized the Debtor to reacquire the receivables it purportedly sold by paying Wynwood the entire amount due under the Wynwood Agreement, thus rendering any purported prohibition against the reacquisition of the receivables illusory. Moreover, the Prepayment Provision makes it clear that the Wynwood Agreement does not condition the Debtor's obligation on the collection of any specific receivables.

In addition to the foregoing features of the Wynwood Agreement's payment terms, which are indicative of a loan transaction, the Wynwood Agreement and related documents granted Wynwood security that reaches far beyond the receivables that Wynwood asserts it purchased given that they granted Wynwood a security interest in essentially all assets of the Debtor and all assets of three of the Debtor's affiliates. Moreover, pursuant to the Wynwood Guarantee, the Debtor's Principal fully guaranteed the Debtor's performance.

The default and remedy provisions in the Wynwood Agreement further support that the transaction is a loan, not a true sale. The events that are considered to be events of default are in many respects punitive, and include failures to provide financial information, even if such information has no impact on the payments to Wynwood. Further, in the event of a default, the Wynwood Agreement and Wynwood Guarantee gave Wynwood rights and recourse far beyond the Receivables Purchased Amount and authorized Wynwood to, among other things, collect the entire balance due under the Wynwood Agreement from any of the Debtor's depository accounts, enforce the Wynwood Guarantee, enforce its security interest in any collateral, and/or require the Debtor to execute an assignment of the lease for its premises in favor of Wynwood.

Further, like the CFG Bankruptcy Provision, the Wynwood Bankruptcy Provision is illusory. Given the nature of the events that constitute a default under the Wynwood Agreement, it is highly improbable that the "anything more" condition in the Wynwood Bankruptcy Provision would not be triggered. In addition, there is nothing in the Wynwood Guarantee or the Wynwood Security Interests Addendum that would prevent Wynwood from pursuing the Debtor's Principal or affiliates for the full balance due. The foregoing reflect that the Wynwood Agreement and

related documents overwhelmingly allocated the risk to the Debtor.

Based upon the undisputed facts and the totality of the foregoing, it is the determination of this Court that the substance of the Wynwood Agreement and related documents reflect that the true nature of the transaction is that of a disguised loan, not a true sale of receivables.

As a result of the Court's determination that the CFG and Wynwood Agreements with the Debtor are in fact loans, not sales, there can be no dispute that the CFG Payments and Wynwood Payments were made to each respective creditor on account of an antecedent debt.

**2. Whether the Payments Were Transfers of Interests of the Debtor in Property**

**a. The Wynwood Agreement**

Wynwood argues that because the Trust Provision in the Wynwood Agreement required the Debtor to hold receivables in trust for Wynwood, regardless of whether the Wynwood Agreement is a loan, the funds used to make the Wynwood Payments were not Debtor funds. As a matter of law, Wynwood's argument fails.

Just as using the words "sale" and "purchase" in an agreement do not make that agreement a purchase agreement, using the words "trust" and "fiduciary" in an agreement do not create a valid trust. Given that the Wynwood Agreement is a disguised loan, not a true purchase agreement, and given that Wynwood's collateral was not specifically identified or segregated and was commingled in a general operating account, the Trust Provision cannot be given effect.[2] As the *Dreier* case cited by Wynwood acknowledges, in order for there to be a valid express trust, there must be funds or property "sufficiently designated or identified to enable title of the property to pass to the trustee[.]" *In re Dreier LLP,* 452 B.R. 391, 420 (Bankr. S.D.N.Y. 2011). A valid trust does not exist in this instance.

**b. The CFG Agreement**

CFG argues that provisions of the CFG Agreement, when read together, likewise lead to the conclusion that the Debtor was holding property for the benefit of CFG. CFG does not elaborate or cite to any specific provisions of the CFG Agreement, and for the same reasons the

---

[2] The facts of *Begier v. Internal Revenue Serv.,* 496 U.S. 53, 110 S. Ct. 2258, 110 L.Ed.2d 46 (1990) (which case involved trust fund taxes), cited by Wynwood for the proposition that the commingling of funds is irrelevant, are inapposite to the facts of this case. The *Begier* case is therefore not applicable.

Wynwood trust argument fails, the CFG argument fails.

Given the foregoing, the Trustee has established that the Payments at issue were Debtor funds. At this point it is clear that the Trustee has satisfied §§ 547(b)(1) and (b)(2).

**3. Whether the Payments Were Made On or Within 90 Days of the Petition Date, While the Debtor was Insolvent**

Insolvency is presumed pursuant to 11 U.S.C. § 547(f), and the Defendants do not dispute that the Debtor was insolvent when it made the Payments. There is also no dispute that the Payments were made during the 90-day period preceding the Petition Date. Thus, §§ 547(b)(3) and (b)(4) have been satisfied.

**4. Whether the Payments Allowed the Defendants to Receive More Than They Would Have Received in a Hypothetical Chapter 7 Liquidation**

Given that the Debtor's Bankruptcy Case was converted to and is proceeding under Chapter 7, the Trustee's hypothetical liquidation analysis is something less than hypothetical. That being said, for purposes of 11 U.S.C. § 547(b)(5), "the trustee must show that the creditor received a greater amount than it would have if the transfer had not been made and there had been a hypothetical chapter 7 liquidation as of the petition date." *Batlan v. TransAmerica Comm. Fin. Corp. (In re Smith's Home Furnishings, Inc.)*, 265 F.3d 959, 963 (9th Cir. 2001).

**a. CFG**

The Trustee asserts that any perfected lien that CFG may have is junior to the lien of Fundamental Capital given that Fundamental Capital filed its UCC-1 Financing Statement before CFG filed its UCC-1 Financing Statement. CFG does not dispute this contention.

Under a § 547(b)(5) analysis, the CFG Payments would have been property of the Chapter 7 bankruptcy estate, subject to valid security interests. The Trustee represents that the value of such hypothetical bankruptcy estate would not have been sufficient to satisfy the senior claim of Fundamental Capital, and CFG does not dispute the Trustee's calculations. At best, under a hypothetical liquidation, CFG would hold an unsecured claim and, as a result, the CFG Payments allowed CFG to receive more than it otherwise would have been entitled to under a hypothetical Chapter 7 liquidation. The Trustee has thus established all elements of her Preference Claim under § 547(b)(1)-(5) as against CFG.

**b. Wynwood**

The Trustee refers to a UCC-1 Financing Statement that was filed by or on behalf of Wynwood prior to the UCC-1 Financing Statements filed by Fundamental Capital and CFG. The Trustee disputes that such UCC-1 Financing Statement covers accounts or assets of the Debtor that existed as of the Petition Date. However, a copy of such financing statement has not been provided to the Court. Therefore, given the incomplete record, the Court has no ability to determine whether or to what extent Wynwood may have held a perfected security interest against any assets of the Debtor on the Petition Date.

The Trustee therefore has not met her burden of establishing that the Wynwood Payments allowed Wynwood to receive more than it would have received in a hypothetical Chapter 7 liquidation. As a result, the Trustee has failed to establish the § 547(b)(5) element of her Preference Claim against Wynwood.

**5. The Defendants' Ordinary Course of Business Defenses**

Although the Trustee has established all elements of her Preference Claim against CFG, and even if the Trustee were to establish all elements of her Preference Claim against Wynwood, the Defendants have raised ordinary course of business defenses pursuant to § 547(c)(2), which provides that a trustee may not avoid a preferential transfer if it was "in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was – (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or (B) made according to ordinary business terms[.]"

The Trustee argues that the Defendants' ordinary course defenses fail because the Defendants have not advanced admissible evidence to support that the transactions were ordinary both as between the parties and under prevailing business standards, and that, to the contrary, the Debtor resorted to the financing at issue only as it was descending into financial distress. However, it is undisputed that the Debtor made regular payments to the Defendants over a period of time, consistent with the terms of the Agreements, and the Defendants have produced declarations in support of their defenses. Given the record and fact-intensive arguments raised by the parties, the Court cannot find that there are no genuine issues of material fact regarding

the applicability of the ordinary course of business defense. As a result, summary judgment is not appropriate and further evidence on this issue is required.

**E. <u>Count Three – The Trustee's Usury Claim</u>**

In the event she cannot recover the Payments, in Count Three, the Trustee asks the Court to order the Defendants to turn over all interest collected under the Agreements on the basis that the Agreements are usurious loans under Arizona law. The Trustee argues that the undisputed facts establish her Usury Claim, and that she is therefore entitled to judgment as a matter of law. The Defendants contend that the Usury Claim fails as a matter of law because New York law, not Arizona law, applies to the Agreements.

Before undergoing a conflict-of-law analysis, the Court must determine whether an actual conflict of law exists. *In re Symons Frozen Foods Inc.*, 432 B.R. 290, 296 (Bankr. W.D. Wash. 2010). Generally speaking, a conflict exists where "two or more states have a legitimate interest in a particular set of facts in the litigation and the laws of those states differ or would produce a different result." *Id*.

In this case, there appears to be an actual conflict given that Arizona, New York, and California have connections to the transactions and/or parties, and Arizona, New York and California have materially different usury laws. *Compare* A.R.S. §§ 44-1201(A)(2) & 44-1202 *with* N.Y. Gen. Oblig. Law § 5-501 *et seq. with* Cal. Const. art. XV, § 1; Cal. Fin. Code § 22002.

"In a bankruptcy case, the court must apply federal choice of law rules." *In re Vortex Fishing Sys., Inc.*, 277 F.3d 1057, 1069 (9th Cir. 2002). In a non-bankruptcy case, a federal court sitting in diversity applies the choice of law rules of the state where the court is located. *Alaska Airlines, Inc. v. United Airlines, Inc.*, 902 F.2d 1400, 1402 (9th Cir. 1990).

In this case, there are both core bankruptcy claims and non-core claims at issue, and the Usury Claim is a state law claim. However, regardless of whether the Court applies federal choice of law rules or Arizona choice of law rules, the result is the same. Both the federal common law and Arizona state law follow the Restatement (Second) of Conflicts (the "Restatement"). *In re Vortez Fishing Sys., Inc.*, 277 F.3d at 1069; *Swanson v. Image Bank, Inc.*, 206 Ariz. 264, 266, 77 P.3d 439, 441 (Ariz. 2003).

Generally speaking, "[u]nder the Restatement approach, the parties' contractual choice will be honored[,]" *Carmel Fin., LLC v. Schoenmann*, 622 F. Supp. 3d 830, 845 (N.D. Cal. 2022), and pursuant to § 187(1) of the Restatement, the law of the state chosen by the parties "will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue."

Given the silence in the briefs, the parties appear to concede that whether an agreement is an unlawful usurious loan is not a "particular issue . . . which the parties could have resolved by an explicit provision in their agreement directed to that issue."

Pursuant to § 187(2) of the Restatement:

> The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
>
> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.
>
> . . . .

Courts generally recognize that "a jurisdiction ordinarily has a substantial relationship to a transaction if one of the parties has its principal place of business there" *Consumer Fin. Prot. Bureau v. CashCall, LLC*, 35 F.4th 734, 744 (9th Cir. 2022), and there is no dispute that the Defendants are located and/or do business in New York. Given the foregoing, the Court cannot find that, based upon record before it, as a matter of law, New York "has no substantial relationship to the parties or the transaction[s] and there is no other reasonable basis for the parties' choice."

As a result, the New York choice of law provisions in the Agreements are to be given effect unless applying New York law "would be contrary to a fundamental policy of a state which has a materially greater interest than [New York] in the determination of the [usury issue] and which, under the rule of § 188 [of the Restatement], would be the state of the applicable law in

the absence of an effective choice of law by the parties." Under the § 188 of the Restatement, the state with the most significant relationship to the transaction and the parties supplies the applicable law in the absence of an effective choice of law by the parties. Rest. § 188(1).

Section 188(2) of the Restatement directs courts to consider the following when determining which state has the most significant relationship to a transaction and the parties to such transaction:

> (a) the place of contracting,
> (b) the place of negotiation of the contract,
> (c) the place of performance,
> (d) the location of the subject matter of the contract, and
> (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

The comments and directives in the Restatement reflect that the Restatement approach is not intended to be formulaic. *In re Mayer*, No. ADV 10-06006, 2011 WL 3299053, at *3 (9th Cir. B.A.P. May 24, 2011). "Rather, courts must evaluate how much weight should be allotted to each of the factors given the specific facts of the case." *Id.* "[A] particular state's contacts are measured on a qualitative rather than a quantitative basis. Thus, more than a mere 'counting' of the contacts is required." *Id.*; *see also In re Zukerkorn*, 484 B.R. 182, 189, n.9 (9th Cir. B.A.P. 2012), *aff'd,* 591 F. App'x 631 (9th Cir. 2015).

In an era when contracts like the Agreements at issue are negotiated and signed electronically, and funds are sent by wire to and from accounts held at financial institutions with a multi-state presence, the traditional, physical anchors that used to play a significant role in conflict of law analyses are, arguably, significantly less important. Given the facts and circumstances of this case, what appears to be an important consideration is where the Debtor conducted its business. The Defendants' funds were presumably used to run that business and the Payments to the Defendants were presumably generated from that business. The parties' briefs presume that the Debtor conducted its business in Arizona, but the record in the Bankruptcy Case and the Agreements themselves reflect that the Debtor conducted its business in California.

As a result, the analyses of both parties in the briefs are incomplete, and the Court cannot determine whether Arizona usury law governs the Agreements. Even if Arizona law does provide

the governing law, an element of the Trustee's Usury Claim is that there must have been "an unlawful intent" *Britz v. Kinsvater*, 87 Ariz. 385, 390, 351 P.2d 986, 989 (Ariz. 1960), which is a fact-intensive issue that, under the circumstances of this case, cannot be resolved at the summary judgment stage. The parties' motions for summary judgment with respect to Count Three are therefore denied.

## V. Conclusion

It is the determination of this Court that the Trustee has established all elements of her Preference Claim against CFG. The CFG Agreement is a loan, the CFG Payments were therefore made to a creditor on account of an antecedent debt, and the CFG Payments were made during the preference period, while the Debtor was insolvent, which allowed CFG to obtain more than it would have been entitled to receive under a hypothetical Chapter 7 liquidation. That being said, there are genuine issues of material fact that preclude this Court from determining the validity of CFG's ordinary course of business defense at the summary judgment stage. As a result, the Trustee's Motion as to Count One against CFG is denied.

The Trustee has likewise established that the Wynwood Agreement is a loan, that the Wynwood Payments were therefore made to a creditor on account of antecedent debt, and that the Wynwood Payments were made during the preference period while the Debtor was insolvent. The Trustee has not, however, established that the Wynwood Payments allowed Wynwood to obtain more than it would have been entitled to receive under a hypothetical Chapter 7 liquidation analysis. As a result, the Trustee has not established all elements of her Preference Claim against Wynwood. Further, there are genuine issues of material fact that preclude this Court from determining the validity of Wynwood's ordinary course of business defense at the summary judgment stage. The Trustee's Motion with respect to Count One against Wynwood is, therefore, denied.

With respect to Count Three, because the parties' choice of law arguments and analyses are incomplete given that they fail to consider the location of the Debtor's business operations, no party has established that it is entitled to judgment as a matter of law. Further, even if Arizona law governs the Agreements, there are genuine issues of material fact as to whether all elements

of Arizona's usury statute are satisfied.

Given the foregoing;

**IT IS HEREBY ORDERED** that the Trustee's Motion is denied and the Defendants' Motion is denied.

**DATED AND SIGNED ABOVE.**

Notice to be sent through the Bankruptcy Noticing
Center ("BNC") to the following:

Squared Up Hospitality, Inc.
4529 S Granite St
Gilbert, AZ 85297
*Debtor*

Notice of Electronic Filing to be sent via email,
through the CM/ECF System, to ALL registered users, including:

Ronald J. Ellett
Ellett Law Offices, P.C.
*Counsel for Debtor*

John C. Smith
Matthew Deweerdt
Rusing, Lopez & Lizardi PLLC
*Counsel for Plaintiff Misty Weigle, Chapter 7 Trustee*

Shanna M. Kaminski
Kaminski Law PLLC
*Pro hac vice Counsel for CFG Merchant Solutions, LLC and Wynwood Capital, LLC*

Jared G. Parker
Parker Schwartz, PLLC
*Counsel for CFG Merchant Solutions, LLC and Wynwood Capital, LLC*

Misty Weigle, Chapter 7 Trustee

U.S. Trustee, Office of the U.S. Trustee